IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BECKLEY DIVISION

LENA JO (ADKINS) BURNS,        )
                                        )
          Plaintiff,           )
                                          )
v.                                )          CIVIL ACTION NO. 5:10-01307
                                        )
MICHAEL J. ASTRUE,        )
Commissioner of Social Security,    )
                                        )
          Defendant.      )

M E M O R A N D U M   O P I N I O N

This is an action seeking review of the decision of the Commissioner of Social Security denying Plaintiff's application for Supplemental Security Income (SSI), under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. This case is presently pending before the Court on the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 11 and 13.) Both parties have consented in writing to a decision by the United States Magistrate Judge. (Document Nos. 7 and 8.)

The Plaintiff, Lena Jo (Adkins) Burns (hereinafter referred to as "Claimant"), filed an application for SSI on May 31, 2007 (protective filing date), alleging disability as of October 1, 2002, due to "nerves, anxiety, depression, panic attacks, manic bi-polar, low blood sugar, seizures, migraines, and arthritis on whole left side of body." (Tr. at 11, 102-05, 122, 126.) The claim was denied initially and upon reconsideration. (Tr. at 61-63, 73-75.) On March 31, 2008, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 76.) The hearing was held on December 15, 2009, before the Honorable William B. Russell. (Tr. at 30-58.) By decision dated March 24, 2010, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 11-24.) The ALJ's decision became the final decision of the Commissioner on October 8, 2010, when the Appeals Council denied Claimant's request for review. (Tr. at 1-5.) On November 16, 2010, Claimant brought

the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2010). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2010). The Commissioner must show two things: (1) that the

claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.
>
> (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two,

3

three, four or more. The last point on each scale represents a degree of limitation that
is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA

determines their severity. A rating of "none" or "mild" in the first three functional areas (activities

of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth

(episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless

evidence indicates more than minimal limitation in the claimant's ability to do basic work activities.

20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[1] Fourth, if the claimant's impairment(s) is/are

deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating

and degree and functional limitation to the criteria of the appropriate listed mental disorder to

determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§

404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental

impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the

Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The

Regulation further specifies how the findings and conclusion reached in applying the technique must

be documented at the ALJ and Appeals Council levels as follows:

---

[1] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including
depression, will be deemed severe when (A) there is medically documented continuous or
intermittent persistence of specified symptoms and (B) they result in two of the following: marked
restriction of activities of daily living; marked difficulties in maintaining social functioning; marked
difficulties in maintaining concentration, persistence or pace; or repeated episodes of
decompensation , each of extended duration or (C) there is a medically documented history of a
chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation
of ability to do basic work activities with symptoms currently attenuated by medication or
psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease
process resulting in such marginal adjustment that a minimal increase in mental demands or change
in the environment would cause decompensation; or (3) a current history of 1 or more years'
inability to function outside a highly supportive living arrangement, and the indication of a
continued need for such an arrangement.

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2) (2010).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since May 14, 2007, the application date. (Tr. at 13, Finding No. 1.) Under the second inquiry, the ALJ found that Claimant suffered from "major affective illness (bipolar); anxiety; borderline range of intellectual functioning; and various arthralgias[,]" which were severe impairments. (Tr. at 13, Finding No. 2.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 15, Finding No. 3.) The ALJ then found that Claimant had a residual functional capacity to perform sedentary exertional work, as follows:

> [T]he undersigned finds that although inclined to find that the claimant would be able to perform a range of light work he has determined that the claimant at least has the residual functional capacity to perform a range of sedentary work (as defined in 20 CFR 416.967(a)) that involves understanding, remembering, and carrying out no more than moderately detailed instructions or work tasks.

(Tr. at 17, Finding No. 4.) At step four, the ALJ found that Claimant could not return to her past relevant work. (Tr. at 22, Finding No. 5.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ also concluded that Claimant could perform jobs such as a tube cashier and a check cashier, at the sedentary level of exertion. (Tr. at 24, Finding No. 9.) On this basis, benefits were denied. (Tr. at 22, Finding No. 10.)

<u>Scope of Review</u>

The sole issue before this Court is whether the final decision of the Commissioner denying

5

the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was born on April 30, 1967, and was 42 years old at the time of the administrative hearing, December 15, 2009. (Tr. at 23, 102.) Claimant had a high school education and was able to communicate in English. (Tr. at 23, 125, 133.) In the past, she worked as a fast food worker, a general laborer, and a convenience store cashier. (Tr. at 23, 126-28.)

The Medical Record

The Court has reviewed all the evidence of record, including the medical evidence, and will summarize it below in relation to Claimant's mental impairments, as they pertain to the majority of her allegations.

Mental Impairments:

### ***Dr. M. K. Hasan, M.D.***:

The medical record contains evidence of Claimant's treatment with Dr. Hasan from February 25, 2005, through November 2, 2005. (Tr. at 285-88.) On February 25, 2005, Claimant reported that she continued "to do fair" and had done "fairly well" since her last visit. (Tr. at 288.) She complained of depression and anxiety, and a diagnosis of bipolar disorder with intermittent explosive disorder, which Dr. Hasan noted was under control with medicine. (Id.) He diagnosed major affective disorder, bipolar in nature, mixed affective state, and advised her to continue Effexor XR, Seroquel, and Ativan. (Id.) On April 5, 2005, Dr. Hasan noted that Claimant continued to do poorly and had a lot of headaches in the form of tension. (Tr. at 287.) He continued her medications and prescribed Inderal 20mg and Lamictal 200mg. (Id.) On July 1, 2005, Nurse Debra R. Mooney noted a diagnosis of major depression and noted Claimant's complaints of depression, panic attacks, and difficulties coping. (Tr. at 286.) On exam, her mood was dysphoric and her affect was restricted, but her conversation was relevant and free flowing. (Id.) Finally, on November 2, 2005, Dr. Hasan noted that Claimant continued to do "fairly well" and that her depression, panic, and anxiety, were under "much better control." (Tr. at 285.) On exam, he noted that her mood was much more stable and she was alert and oriented. (Id.) Dr. Hasan diagnosed major depression with intermittent explosive disorder and a history of panic disorder. (Id.)

### ***Appalachian Regional Health Care, Inc.***:

On October 15, 2006, Claimant was sent to the hospital for an overdose of sleeping medication, having had taken approximately 60 Seroquel 25mg tablets, and was released on October 26, 2006. (Tr. at 325-26, 328.) Mental status exam on October 16, 2006, by Dr. Faheem revealed that Claimant was tense, anxious, edgy, and depressed, with impaired attention and concentration. (Tr.

at 310.) She was oriented to time, person, and place and had intact memory, recall, and judgment. (Id.) Dr. Faheem noted that she was not actively suicidal or homicidal. (Id.) He diagnosed major affective illness and bipolar, depressed. (Tr. at 311.)

On October 18, 2006, Samantha Mann, M.A., a licensed psychologist, performed a psychological evaluation of Claimant. (Tr. at 302-04.) Claimant reported that she was tired of being a burden to everybody and that she had previously attempted suicide on March 6, 2006. (Tr. at 302.) On the most recent attempt, Claimant reported that she had threatened to shoot herself or slit her wrists, but instead, overdosed on Seroquel. (Id.) On mental status exam, Ms. Mann noted that Claimant was going through a divorce; was oriented and spoke with a normal tone and was understandable; exhibited coherent and logical thought processes; had good immediate, recent, and remote memories; that her mood and affect were depressed; and that she was cheerful throughout much of the interview and part of the testing. (Tr. at 303.) She denied delusions or hallucinations and suicidal ideation. (Id.) The Kaufman Brief Intelligence Test (KBIT-2) revealed a lower range of intellectual ability and the WRAT-3 revealed sixth grade reading and spelling levels and a third grade arithmetic level. (Id.) Ms. Mann diagnosed major depressive disorder, severe, recurrent, without psychosis; and generalized anxiety disorder and assessed a GAF of 30.[2] (Tr. at 304.)

Dr. Charles Porterfield, D.O., evaluated Claimant on October 19, 2006, and noted that she was alert and oriented and was in no acute distress. (Tr. at 295.) He concluded that Claimant was stable and that she may have had glucose intolerance. (Tr. at 296.)

---

[2]The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100. A GAF of 21-30 indicates that the person's behavior is considerably influenced by delusions or hallucinations, or a serious impairment in communication or judgment, or an inability to function in almost all areas (such as staying in bed all day; no job, home, or friends). American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994).

Claimant was discharged on October 25, 2006, at which time Dr. Faheem assessed a GAF of 60,[3] with final diagnoses of major affective illness, depression, and recurrent anxiety disorder not otherwise specified. (Tr. at 289-90.)

***Ahmed D. Faheem, M.D.***:

Claimant initiated treatment with Dr. Faheem on June 14, 2006. (Tr. 763-64.) Claimant reported a dislike of crowds, major mood fluctuations, depression, feelings of tiredness and being rundown, feelings of a lack of purpose in life, hopeless and helpless feelings, headaches, restless sleep, paranoia, aggravation, and a need to maintain control. (Tr. at 763.) She denied suicidal or homicidal ideations. (Id.) She reported her activities to have included caring for herself, driving, trying to do housework, some cooking, and some painting and ceramic work. (Id.) Dr. Faheem noted on exam that she was tensed, anxious, edgy, and labile, but mostly depressed. (Tr. at 764.) Memory and judgment were intact. (Id.) He diagnosed major affective illness, bipolar (depressed) and panic anxiety disorder. (Id.) Dr. Faheem also assessed a GAF of 55. (Id.)

On November 1, 2006, Claimant was alert, oriented, and cooperative; had no hallucinations or delusions; and was not suicidal. (Tr. at 419, 762.) Dr. Faheem noted on February 1, April 4, May 31, and July 26, 2007, that Claimant continued to remain alert, oriented, and cooperative on exam and reported no hallucinations, delusions, or suicidal ideation. (Tr. at 418, 420-22, 758-61.) He noted on April 4, 2007, that Claimant had recurrent panic attacks. (Tr. at 760.) On July 31, 2007, Dr. Faheem noted that Claimant continued to have difficulty sleeping but that "[o]therwise, she is doing okay." (Tr. at 758.) On September 20, 2007, Claimant reported that she was "not doing too good," though Dr. Faheem's exam notes remained the same. (Tr. at 757.) On November 15, 2007, Dr.

---

[3] A GAF of 51-60 indicates that the person has moderate symptoms, or moderate difficulty in social, occupational or school functioning. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994).

Faheem noted that Claimant's attention and concentration were normal and he adjusted her medications. (Tr. at 449, 756.)

On January 7, 2008, Dr. Faheem completed a form Medical Assessment of (Mental) Ability to Do Work-Related Activities. (Tr. at 751-54.) He assessed that Claimant had a fair ability to use judgment, function independently, maintain personal appearance, relate predictably in social situations, and understand, remember, and carry out simple job instructions. (Tr. at 752-53.) He further assessed that she had poor ability to follow work rules, relate to co-workers, deal with the public, interact with supervisors, maintain attention and concentration, behave in an emotionally stable manner, demonstrate reliability, and understand, remember, and carry out detailed job instructions. (Id.) He finally assessed no ability to deal with work stresses and understand, remember, and carry out complex job instructions. (Tr. at 752.) Dr. Faheem opined that Claimant was "disabled from being gainfully employed for a period of a year or longer[,]" and that she was not a candidate for successful rehabilitation. (Tr. at 754.)

On January 14, 2008, Claimant reported that as long as she took her medications, she did "okay." (Tr. at 755.) Dr. Faheem noted that she was alert, oriented, and cooperative; had no hallucinations, delusions, or suicidal ideations; and had normal attention and concentration. (Id.) On January 17, 2008, Dr. Faheem completed a Psychiatrist's Summary for the West Virginia Department of Health and Human Resources, on which he stated that Claimant

> has problems with major mood fluctuations, difficulty with concentration, mood swings, irritability, upset. She is on multiple medications and cannot cope with stresses and cannot cope with working. She is not a candidate for successful rehabilitation.

(Tr. at 571.) In a general letter on the same date, Dr. Faheem noted that Claimant was in need of continued psychiatric treatment and was "disabled and unable to work." (Tr. at 766.) Claimant reported on April 7, 2008, that she was "doing okay" and that the then present combination of

medications was working "all right." (Tr. at 765.) Dr. Faheem noted that she continued to have some mood swings, but "not as bad," and that overall, "things appear[ed] to be progressing okay." (Id.) On June 30, 2008, Claimant reported continued sleep difficulty but denied any major out of the ordinary problems. (Tr. at 705.) On August 11, 2008, Claimant reported that she had an altercation with her daughter, but Dr. Faheem found that she was alert, oriented, and cooperative; reported no hallucinations or delusions; and denied suicidal or homicidal ideation. (Tr. at 704.) Dr. Faheem noted on September 22, 2008, that Claimant "gets down, but she is otherwise doing okay." (Tr. at 703.) He noted that the medications seemed "to work out all right for her" and that she was taking one at a time." (Id.) On exam, she was alert, well oriented, and cooperative; reported no hallucinations or delusions; her attention and concentration was impaired; she was not suicidal; and her memory, recall, and judgment were intact. (Id.)

On January 12, 2009, contrary to benign clinical findings and noting that Claimant was "handling herself all right," Dr. Faheem opined that Claimant's prognosis was poor. (Tr. at 700, 702.) He opined that she had mood fluctuations, difficulty in concentration, chronic pain, and difficulty coping with stresses and handling job related pressures. (Tr. at 700.) On April 6 and May 4, 2009, Claimant reported that she was not doing good and had continued problems with mood fluctuations. (Tr. at 701, 722.) Dr. Faheem noted however, benign mental status findings, though she had impaired attention and concentration on May 4, 2009. (Id.) On July 1, 2009, Claimant reported that she was having a lot of problems with concentration, staying on task, and doing things in an organized manner. (Tr. at 721.) Dr. Faheem suggested that she be tested for ADHD. (Id.)

Claimant reported on July 29, 2009, that she was "doing okay" and that Strattera helped with her concentration. (Tr. at 717.) On September 24, 2009, Dr. Faheem noted that Claimant was depressed due to marital problems but that with the exception of impaired attention and

11

concentration, had benign mental status exam findings. (Tr. at 716.) Claimant reported on October 23, 2009, that she was depressed, but that she was not agitated, aggressive, or suicidal, and had no hallucinations or delusions. (Tr. at 715.)

On November 3, 2009, Dr. Faheem completed a form Medical Assessment of (Mental) Ability to Do Work-Related Activities. (Tr. at 725-28.) Dr. Faheem opined that Claimant had no ability to interact with supervisors, deal with work stresses, or demonstrate reliability. (Tr. at 726-27.) He assessed poor ability to maintain personal appearance, behave in an emotionally stable manner, follow work rules, relate to co-workers, deal with the public, maintain attention and concentration, and understand, remember, and carry out detailed and complex instructions. (Id.) Finally, he assessed fair ability to use judgment, function independently, relate predictably in social situations, and understand, remember, and carry out simple job instructions. (Id.) He assessed that she was able to manage benefits in her own best interest. (Tr. at 728.)

### _State Agency Psychologists_:

On September 25, 2007, state agency psychologist Rosemary L. Smith, Psy.D., reviewed Claimant's records and completed a form Psychiatric Review Technique. (Tr. at 431-44.) Dr. Smith assessed that Claimant had mild limitations in activities of daily living and maintaining concentration, persistence, or pace; moderate restrictions in maintaining social functioning; and one or two episodes of decompensation each of extended duration. (Tr. at 441.) She also completed a form Mental Residual Functional Capacity Assessment on which she opined that Claimant was moderately limited in her ability to interact appropriately with the general public and accept instructions and respond appropriately to criticism from supervisors. (Tr. at 445-46.) She opined that Claimant retained the ability "to learn and perform a variety of work-like activities in an environment that involves little to no direct interaction with the public or supervisor(s)." (Tr. at 447.)

12

On March 7, 2008, Jeff Harlow, Ph.D., reviewed Claimant's records and also completed a form Psychiatric Review Technique. (Tr. at 580-93.) Dr. Harlow noted that Claimant's bipolar disorder was non-severe; that she had mild limitations in activities of daily living and maintaining social functioning, concentration, persistence, or pace; and that she had no episodes of decompensation each of extended duration. (Tr. at 580, 590, 594, 604.) Dr. Harlow also noted that Dr. Faheem's comments about Claimant's functional capacities were "externally inconsistent with clinical results." (Tr. at 592, 606.)

***Edward A. Jones, M.A.***:

On July 28, 2009, Claimant was evaluated by psychologist Edward A. Jones, M.A., who conducted psychological testing (Tr. at 718-20.) Mr. Jones noted that Claimant failed to take her prescribed Strattera 40mg, for concentration, prior to 24 hours before the exam. (Tr. at 718.) On mental status exam, he noted that rapport was easily established; her speech was clear and easily understood; she spontaneously generated conversation; she displayed a sense of humor; her mood was dysphoric and her affect was blunted; she was alert and oriented; her judgment was intact, as was her immediate and remote memory, and concentration, but her recent memory was severely impaired; her attention was moderately impaired; and she acknowledged fleeting suicidal ideation, but denied plan or attempt. (Id.) Claimant's KBIT-2 composite IQ score was 73, which indicated a lower extreme to below average range of intellectual functioning. (Tr. at 719.) The results of the WRAT-4 however, did not suggest the presence of a learning disorder. (Id.) Mr. Jones noted that Claimant's self-reported symptoms of depression and anxiety were in the severe range. (Tr. at 719-20.)

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in not giving appropriate weight to the assessments of Dr. Faheem. (Document

No. 12 at 6-8.) Claimant asserts that Claimant treated with Dr. Faheem for approximately four years and her mental condition markedly worsened. (Id. at 7.) She asserts that the ALJ erred in giving greater weight to the opinions of the state agency consultants because they were not as familiar with Claimant as was Dr. Faheem and were not able to weight in on her abilities and lack thereof. (Id.) Claimant further asserts that she was consistent in relating that she was very limited socially due to panic attacks, depression, and fluctuations in mood. (Id.)

In response, the Commissioner asserts that Claimant's argument is without merit. (Document No. 13 at 13-16.) The Commissioner first asserts that the determination of Claimant's disability is an issue reserved specifically to the Commissioner. (Id. at 13.) Therefore, the ALJ was not required to accord any particular weight or deference to Dr. Faheem's opinion. (Id.) The Commissioner next asserts that Dr. Faheem's assessments were unsupported by his own treatment notes, which revealed relatively benign findings. (Id. at 13-14.) Finally, the Commissioner asserts that Dr. Faheem's assessed limitations were unsupported by the objective medical evidence, particularly the opinions of the state agency consultants, Drs. Smith and Harlow. (Id. at 15-16.) Accordingly, the Commissioner contends that the ALJ gave appropriate weight to Dr. Faheem's assessments. (Id.)

Claimant next alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ failed to establish appropriate "baselines as to the [Claimant's] exertional and non-exertional abilities, which in turn prevented the [Claimant] from having an appropriate and fair assessment of her vocational potential." (Document No. 12 at 8.) Essentially, Claimant asserts that the ALJ failed to question appropriately the VE to establish the baselines for her exertional and non-exertional limitations. (Id.)

In response, the Commissioner asserts that the ALJ "generously accounted for [Claimant's] physical and mental functional limitations in light of the benign clinical findings reported by her

14

treating physicians, and the opinions of the state agency physicians, who assessed that she had essentially no physical or mental limitations." (Document No. 13 at 18.) The Commissioner asserts that the ALJ properly questioned the VE and was entitled to rely on the VE's testimony. (Id.) The Commissioner notes that Claimant fails to identify what limitation was not captured by the RFC or jobs identified by the VE. (Id.) Therefore, the Commissioner asserts that there was nothing in the record to support additional limitations described by Claimant and that the ALJ permissibly disregarded them. (Id. at 19.)

Analysis.

1. Treating Psychiatrist's Opinion.

Claimant first asserts that the ALJ failed to give appropriate weight to the opinions of his treating psychiatrist, Dr. Faheem. (Document No. 12 at 6-8.) "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record," including " the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a), 416.945(a) (2010). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

Opinions on a claimant's Residual Functional Capacity are issues that are reserved to the Commissioner. The Regulations state that:

> We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter, your residual functional capacity . . . or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

See 20 C.F.R. § 416.927(e)(2) (2010).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

The Regulations state that opinions on these issues are not medical opinions as described in the Regulation dealing with opinion evidence (20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2)); rather, they are opinions on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e) and 416.927(e). For that reason, the Regulations make clear that "[w]e will not give any special significance to the source of an opinion on issues reserved to the Commissioner. . . ." Id. §§ 404.1527(e)(3) and 416.927(e)(3). The Regulations further provide that "[f]or cases at the Administrative Law Judge hearing or Appeals Council level, the responsibility for deciding your residual functional capacity rests with the Administrative Law Judge or Appeals Council." See 20 C.F.R. §§ 404.1545 and 416.946 (2010). However, the adjudicator must still apply the applicable factors in 20 C.F.R. § 416.927(d) when evaluating the opinions of medical sources on issues reserved to the Commissioner. See Social Securing Ruling ("SSR") 96-5p, 61 FR 34471, 34473 (1996).

Social Security Ruling 96-5p makes a distinction between an RFC assessment, which is "the

16

adjudicator's ultimate finding of 'what you can still do despite your limitations,'" and a "'medical source statement,' which is a 'statement about what you can still do despite your impairment(s)' made by an individual's medical source and based on that source's own medical findings." Id. SSR 96-5p states that "[a] medical source statement is evidence that is submitted to SSA by an individual's medical source reflecting the source's opinion based on his or her own knowledge, while an RFC assessment is the adjudicator's ultimate finding based on a consideration of this opinion and all the other evidence in the case record about what an individual can do despite his or her impairment(s)." Adjudicators "must weigh medical source statements under the rules set out in 20 C.F.R. § 416.927, providing appropriate explanations for accepting or rejecting such opinions." Id. at 34474.

Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2010). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3),

(4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ must explain in the decision the weight given to the opinions of state agency psychological consultants. 20 C.F.R. §§ 404.1527(f)(2)(ii) and 416.927(f)(2)(ii) (2010). The ALJ, however, is not bound by any findings made by state agency medical or psychological consultants and the ultimate determination of disability is reserved to the ALJ. Id. §§ 404.1527(f)(2)(I) and 416.927(f)(2)(I).

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2010). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2010). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2010). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

If the ALJ determines that a treating physician's opinion should not be afforded controlling

weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6).

In his decision, the ALJ summarized Dr. Faheem's treatment notes and his opinions and rejected his opinions regarding Claimant's mental functional limitations essentially because they were inconsistent with his treatment notes. (Tr. at 19-20.) The ALJ noted that in October, 2006, upon Claimant's discharge from the hospital, Dr. Faheem assessed a GAF of 55, which was indicative of no more than moderate symptoms. (Id.) The ALJ found that Dr. Faheem's treatment notes, as summarized above, continuously showed "no significant deterioration in her mental status." (Tr. at 20.) As summarized above, despite sporadic episodes of mood swings, Dr. Faheem consistently noted benign mental status exam findings, with the exception of some impaired concentration and attention. Dr. Faheem remarked on several occasions that Claimant was doing "okay" and that her medications were working out for her. The ALJ additionally noted that Claimant's course of treatment was inconsistent with one who was disabled in that she was never referred to individual or group counseling. (Id.) The ALJ also noted that Dr. Faheem's opinions primarily were in the form of a checklist, on which he gave no detailed explanation as to why Claimant was limited to the extent determined. (Id.)

The ALJ also noted that Dr. Faheem's opinions were inconsistent with the state agency reviewing psychologists' opinions. (Tr. at 20.) As noted above, Dr. Smith assessed only mild limitations in activities of daily living and maintaining concentration, persistence, or pace. (Tr. at 20, 441.) Dr. Harlow opined that Claimant's mental impairments were not severe and that he had only mild limitations. (Tr. at 20, 594, 604.) The ALJ found that these two opinions were supported by the objective clinical findings. (Tr. at 20.) Nevertheless, the ALJ gave the state agency psychologists' opinions little weight because there was no evidence to support a finding of moderate limitations in

19

social functioning. (Tr. at 20.) The ALJ found that clinical findings revealed that Claimant was consistently alert, oriented and cooperative. (Id.) The ALJ also gave little weight to the state agency psychologists' opinions that Claimant had only a mild limitation in a reduction in concentration and gave Claimant the benefit of the doubt because the "combination of her depression, anxiety, and apparent 'borderline intellectual functioning' is more than likely going to diminish her ability to perform skilled work tasks, but not tasks that involve understanding, remembering, and carrying out moderately detailed instructions and work tasks." (Tr. at 20.)

Based on the foregoing, the Court finds that the ALJ properly assessed the evidence regarding Claimant's mental impairments and limitations and assigned appropriate weight to the opinions of the state agency psychologists and to Dr. Faheem. Accordingly, the Court finds that substantial evidence supports the ALJ's findings as to the weight assigned to the various opinions and that Claimant's arguments are without merit.

2. <u>VE Testimony</u>.

Claimant next alleges that the ALJ failed to question the VE appropriately to establish the "baselines" for her exertional and non-exertional limitations. (Document No. 12 at 8.) Specifically, Claimant asserts that the ALJ never established baselines regarding Claimant's postural activities and her ability to sit, stand, or walk. (Id.) To be relevant or helpful, a vocational expert's opinion must be based upon consideration of all evidence of record, and it must be in response to a hypothetical question which fairly sets out all of the claimant's impairments. <u>Walker v. Bowen</u>, 889 F.2d 47, 51 (4th Cir. 1989). "[I]t is difficult to see how a vocational expert can be of any assistance if he is not familiar with the particular claimant's impairments and abilities – presumably, he must study the evidence of record to reach the necessary level of familiarity." <u>Id.</u> at 51. Nevertheless, while questions posed to the vocational expert must fairly set out all of claimant's impairments, the

questions need only reflect those impairments that are supported by the record. See Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987). Additionally, the hypothetical question may omit non-severe impairments, but must include those which the ALJ finds to be severe. See Benenate v. Schweiker, 719 F.2d 291, 292 (8th Cir. 1983).

The transcript of the administrative hearing reveals that the ALJ questioned the VE regarding transferability of skills from Claimant's past relevant work to the sedentary level and to determine whether Claimant could perform other jobs despite her limitations. (Tr. at 39-42, 52-57.) The ALJ found that Claimant was most likely able to perform her past relevant work as a fast food worker and a cashier, but gave her the benefit of the doubt that she was limited to a range of sedentary work, and therefore, was unable to perform her past relevant work at the light exertional level. (Tr. at 23.)

Claimant asserts that the ALJ failed to establish baselines for her exertional and non-exertional limitations. As the Commissioner notes however, she failed to cite to any authority that the ALJ failed to establish such baselines. The ALJ assessed mental limitations that she perform work that involved understanding, remembering, and carrying out no more than moderately detailed instructions or work tasks, which was consistent with the jobs identified by the VE. To the extent that Claimant alleges that the ALJ was required to adopt the VE's testimony in response to her attorney's questioning, the Court finds that the ALJ was allowed to discount limitations not supported by the record. The Court finds that additional limitations were not supported by the record and that the ALJ was permitted to rely on the testimony of the VE. Accordingly, the Court finds that the ALJ's decision is supported by substantial evidence of record.

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment Order entered this day, the Plaintiff's Motion for Judgment on the Pleadings (Document No. 11.) is

**DENIED**, Defendant's Motion for Judgment on the Pleadings (Document No. 13.) is **GRANTED**, the final decision of the Commissioner is **AFFIRMED**, and this matter is **DISMISSED** from the docket of this Court.

.       The Clerk of this Court is directed to send a copy of this Memorandum Opinion to counsel of record.

        ENTER: March 30, 2012.

R. Clarke VanDervort
United States Magistrate Judge